**In re CUMBERLAND INVESTMENT CORPORATION, Debtor.**

**Bankruptcy No. 89–11051.**

United States Bankruptcy Court,
D. Rhode Island.

Aug. 9, 1990.

John Boyajian, Boyajian, Harrington & Richardson, Providence, R.I., for debtor.

David N. Cicilline, Providence, R.I., for Harold Chorney.

Patricia Antonelli, Asst. U.S. Trustee, Boston, Mass.

Peter J. Furness, Hinckley, Allen, Snyder & Comen, Providence, R.I., for Eastland Bank.

Edward J. Bertozzi, Jr., Edwards & Angell, Providence, R.I., for Examiner, Michael Weingarten.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard, most recently, on July 25, 26 and 31, 1990, on the Motion of the U.S. Trustee for the appointment of a Chapter 11 Trustee, and also on the Motion of Eastland Bank for various forms of relief that are specified in detail in its lengthy motion.

The dubious travel of this case began, *in this Court*,[1] on November 8, 1989, when an involuntary Chapter 7 petition was filed against CIC. Less than one month later, on December 6, 1989, CIC filed a Notice of Conversion to Chapter 11, and an appropriate order for relief was entered. On the same date as the conversion notice, Eastland Bank and two other creditors filed a Motion for Appointment of a Chapter 11 Trustee. After hearing, this Court denied (regrettably, with hindsight) the motion for appointment of a Chapter 11 Trustee, and instead, authorized the appointment of an examiner, which the U.S. Trustee accomplished on December 18, 1989. Simultaneous with the appointment of the examiner, the debtor was restrained from selling coins, except with prior Court approval, pending the results of the examiner's investigation.

In this case to date, the examiner has filed 5 reports consisting of 93 pages, 11 days of contested hearings have been held, and almost 100 exhibits have been introduced into evidence.

Although the Bankruptcy Code clearly favors the continuance of the debtor-in-possession in Chapter 11 cases, it also recognizes the need, and provides for the termination of debtor control, in appropriate circumstances. In this regard, the standard for the appointment of a Chapter 11 Trustee is:

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(1) and (2).

Without undue elaboration, the end product of more than seven months of investigation and litigation is that the interest of creditors in this case requires the appointment of a Chapter 11 Trustee, forthwith. It is also clear that debtor's counsel's request that CIC, by its present management, should be permitted to continue in possession, to submit a plan, and to liquidate the assets, is absolutely out of the question. Approval of such a request would amount to this Court's ratification of a course of mismanagement and disregard of the bankruptcy process by a debtor-in-possession whose principles are not merely inept or incompetent—to the contrary, the Chorneys and their agents have done a disturbingly good job of postponing this long-overdue day of reckoning. These findings and conclusions have not been arrived at hastily, but rather are the result of the debtor's repeated failure to respond

---

1. Prior to the involvement of this Court, on October 23, 1989, Eastland Bank petitioned CIC into an involuntary receivership proceeding in State Court. A temporary receiver was appointed, and soon thereafter, on November 8, 1989, an involuntary Chapter 7 petition was filed in this Court.

adequately to continuing allegations of wrongdoing, supported by an overwhelming amount of negative evidence—all of which establishes that this debtor has been in possession too long.

CIC's credibility began to evaporate early on, with its assertion in the sworn schedules that the inventory had a value of nearly 24 million dollars, and in verbal representations to the examiner, wherein Mr. Chorney initially made statements that the inventory had a value of 27 to 30 million dollars. (*See* Examiner's Report 1, p. 2.) The credibility gap widened, with our total rejection[2] of CIC's fall back argument which may be paraphrased as:—"OK, if the inventory is not as represented in the schedules, then it's because Eastland Bank has taken the bulk of our MS65 coin inventory, and replaced it with coins of lesser value." We found no substance whatsoever to support such a serious charge. *See* July 11, 1990 Decision and Order.

To compound its credibility problems, the debtor has continued to misrepresent, right up until the present, for all we know,—"all coins guaranteed MS65 or better", (*see* Exhibit Nos. 4, 5, 17, 18, 19, 23, 26, 27, 30, 37, 48), as well as other guarantees that it cannot possibly honor. (*See* Exhibit Nos. 2, 3, 4, 5, 6, 10, 17, 18, 19, 23, 25, 26, 27, 28, 29, 30, 31, 32, 36, 37, 42, 48.) Since the inception of this case, there has emerged a pattern of inconsistency in positions taken by the debtor, under the direction of Hal Chorney, which is highlighted through the testimony of one of its own witnesses: George Manter testified that coins graded in 1984 and '85 as MS65 would probably be graded today as "anywhere from MS60 to 64." This supports the examiner's position that the debtor should not be continuing to represent its coins as "MS65 or better". The debtor, of course, has never stopped making such representations. Mr. Manter also stated without hesitation that he disapproved of the practice of making such guarantees.

Incomprehensibly, Harold Chorney continues to place the debtor into one indefensible position after another, with each one more difficult to sustain than its predecessor. For example:

(1) At the outset, Chorney stated, under oath, that the assets of his corporation had a value of nearly 24 million dollars.

(2) When the post-petition scrutiny began to show conclusively that the debtor's stated value of the inventory had to be a gross exaggeration, Chorney shifted gears and accused Eastland Bank of wrongfully and illegally removing (stealing, I guess) CIC's "MS65's or better," and substituting lower grade coins in their place.

(3) After that allegation was rejected as a complete fabrication in our July 11, 1990 Decision and Order, Mr. Chorney again changed direction, arguing that grading standards have tightened since 1985, and that the present standards are much more stringent. For once we are in agreement with Mr. Chorney, but only briefly however, because we are also at a loss to reconcile the present more rigorous grading standards with CIC's continuing post-petition, but pre–1985 "MS65 or better" guarantees. By this, of course, we refer to the fact that CIC, as debtor-in-possession, has continued to advertise on radio and in writing, and to represent to the public "All coins guaranteed MS65 or better", "full 12 month money back guarantee", and "15% is the least paid after 1 year and 1 day"—all guarantees which Chorney has demonstrated he cannot honor. (*See* Exhibit No. 17.)

The debtor's right to remain in possession is further eroded by its unauthorized and transparent business operations, through fraudulently concocted alter egos such as Financial Privacy Consultants ("FPC"), which we find to be nothing more than an undisclosed agent of the debtor-in-possession. Moreover, we find that Harold Chorney and Gerald Aubin acted together and interchangeably with the public, in behalf of CIC, to make unauthorized post-petition coin sales in excess of $34,000. This

---

**2.** See our Decision and Order dated July 11, 1990, 116 B.R. 353, denying the Debtor's Motion to Strike the Examiner's Report No. 2.

figure only includes sales which Eastland Bank was able to uncover, and is exclusive of unascertained CIC and FPC sales which we may never learn about. The foregoing conclusions are based on the totality of the evidence, including but not limited to the facts that: (1) both entities are located in the same building; (2) the same principals conducted the business of both entities; (3) the same type of business is conducted by both entities, and (4) the same customers purchased coins from both companies.

As for the debtor's assertion that CIC and FPC are separate and distinct entities, we refer specifically to:

(1) The Karapondo sale—Jeannette Karapondo testified that her first contact with CIC was in January 1990, as a result of a radio advertisement in New York City which gave an 800 telephone number. The 800 number lead her to Gerald Aubin, who, on behalf of CIC, mailed literature to her about the advantages of investing in silver dollar coins. Thereafter, Aubin, not having heard from Karapondo who was having serious second thoughts about investing in silver dollars at all, sent a follow-up letter. In response to this letter, Karapondo mailed a check for $1,110.00 to Aubin, which CIC deposited on 3/29/90. (*See* Exhibit No. 12.) Mrs. Karapondo dealt with Aubin exclusively from January through May 1990, and at no time during that period was she informed of the Chapter 11 proceeding, or of the injunction against the debtor's ability to do business as usual. When coins did not arrive in the mail, as promised, and after getting numerous unsatisfactory explanations from CIC,[3] Mrs. Karapondo finally spoke personally with Harold Chorney, who told her that CIC's coin inventory had been seized by the Bank. (*See* Exhibit No. 14.) To date, Mrs. Karapondo has not received any coins, nor has her money been returned.

(2) The Hersey sale—David Hersey testified that he had previously purchased coins from CIC in May, 1985. Then, sometime in January or February 1990, he was contacted by Gerald Aubin, who suggested that he "roll over" his CIC coins. At Aubin's suggestion, on March 9, 1990, Hersey went to the CIC offices, saw a promotional slide show, and then had a meeting with Hal Chorney. After receiving an apparently successful sales pitch, Hersey did "roll over" his existing investment, and also purchased a new set of coins, directly from Harold Chorney, for $9,100 in cash (for which he received a discount). The invoice evidencing this purchase was on FPC stationery. (*See* Exhibit No. 20.) Hersey testified, and we believe, that he thought he was dealing with and purchasing coins from CIC, and had no knowledge of an entity called Financial Privacy Consultants.

(3) The "Cumberland 12 Gifts of Holidays" flyer. (*See* Exhibit No. 24.) This document directs customers to make all checks payable to "Financial Privacy Consultants."[4]

(4) An AT & T Installment Sale Contract/Equipment Lease Agreement dated June 15, 1987, signed by Gerald Aubin on behalf of "Harold Chorney DBA Cumberland Investment". (*See* Exhibit No. 43.)

These examples are typical (but not all inclusive) of the reasons for the failure of the Chorney–Aubin effort to distinguish between these two companies, vis-a-vis the public. For obvious reasons, we also decline to recognize any separation between them. Accordingly, it is our conclusion that all business conducted by FPC after this Court's December 1989 injunction was orchestrated by Harold Chorney with the intention to circumvent said restraint. It is this pervasive, broad course of debtor misconduct which calls out for the appointment of a Trustee, to protect the interest of

---

**3.** Mrs. Karapondo was initially told that her coins were in the mail. When still no coins arrived, she was told that CIC's secretary had been in a car accident and that the paperwork was all messed up. Finally, Hal Chorney wrote her a letter stating that the coins had been seized by Eastland Bank.

**4.** This intentional diversion of a CIC receivable is a serious violation of the debtor's responsibility to creditors, as well as the possible commission of a bankruptcy crime. *See,* 18 U.S.C. § 152.

creditors of this estate, and possible future creditors.

Lastly, but certainly not least in order of importance herein, is our reliance on the extensive investigation conducted by the examiner, and his recommendations to the Court. After review of the five reports submitted, and the lengthy testimony at trial, we accept and adopt the findings and recommendations of the examiner, without qualification. The examiner has recommended that the business operations of CIC be terminated, and a trustee be appointed forthwith, for the following reasons:

(1) The premises and inventory remain in complete disarray.[5] Notwithstanding that the assets are probably worth many millions less than represented, the inventory does have considerable value, and deserves better treatment;

(2) There is inadequate security, considering the nature and quantity of the inventory. We disagree with the examiner's description of the security as "inadequate", and prefer to say that security is non-existent;

(3) The debtor's obstruction of the grading process, specifically on May 7, 1990, and, in general, with respect to denying the examiner access to redemption coins;[6]

(4) The falsity of the debtor's assertion that it uses the "first in, first out" method with respect to payment to redemption customers. The company records do not support this position, but instead, establish that CIC has no ascertainable policy as to treatment of its redemption customers, who constitute the majority of unsecured creditors of this debtor;

(5) The debtor's continued post-petition sale of coins, the majority of which were done without court authorization; (See Exhibit No. 16.) In this regard we reject as a red herring the debtor's concentration, in argument, on the so-called "time of confusion" regarding our order of injunction,

and find it to have little to do with the merits of this case. In any event, any such alleged "confusion" was not a green light for the debtor to conduct sales without compliance with previously established guidelines;

(6) The debtor's continued false advertising; (See Exhibit No. 17, dated 6/22/90.)

(7) The examiner's conclusion, after numerous grading processes, that 90% of the debtor's silver dollar inventory was *not* MS65 or better; and,

(8) The debtor's complete disregard for the U.S. Trustee reporting requirements. The debtor's last bi-weekly report was filed in March 1990.

The debtor has raised an issue as to the real position of the unsecured Creditors' Committee, vis-a-vis the appointment of a Chapter 11 trustee. We reject the inference of Terrance McKenna that the position of the Creditors' Committee is not as represented by its counsel, Matthew McGowan, Esq. McKenna is a friend of Hal Chorney, and we find that this friendship has overridden his ability to exercise reasonable judgment, evidenced by his letter to the Court dated August 3, 1990 and enclosure, which has the earmarks of an attempted judicial end-run that is reminiscent of, and probably attributable to Harold Chorney. We accept Mr. McGowan's representation that the Creditors' Committee supports the U.S. Trustee's motion to appoint a Chapter 11 Trustee in this case.

Based on all of the foregoing, we conclude that both 11 U.S.C. §§ 1104(a)(1) and (2) have been satisfied and accordingly, the U.S. Trustee's (and Eastland Bank's) Motion to Appoint a Trustee is GRANTED. Finally, because of the strong evidence of continuing debtor-in-possession misconduct, we also ORDER the immediate discharge of all present employees of Cumberland Investment Corporation, including its prin-

---

**5.** Based on the evidence, as confirmed during the view taken by the Court on July 17, 1990, the inventory is so poorly stored and cataloged that losses would be virtually undetectable. This gives the Court great concern.

**6.** We reject, as without merit, the debtor's explanation why it would not consent to such grading, where it has never even notified redemption customers of this bankruptcy proceeding. We view this as yet another obstructive tactic, in a series of many.

cipals, Harold Chorney, Lou Chorney, and Gerald Aubin.

Enter Judgment accordingly.